1   RUSS, AUGUST & KABAT
    Brian D. Ledahl (CA SBN 186579)
2   bledahl@raklaw.com
    Neil A. Rubin (CA SBN 250761)
3   nrubin@raklaw.com
    Mackenzie Paladino (NY SBN 6039366)
4   mpaladino@raklaw.com
    12424 Wilshire Boulevard, 12th Floor
5   Los Angeles, California 90025
    Telephone: (310) 826-7474
6   Facsimile:   (310) 826-6991

7   Attorneys for Defendants
    *IPValue Management, Inc. and*
8   *Longitude Flash Memory Solutions Ltd.*

9

10                      **UNITED STATES DISTRICT COURT**

11                      **NORTHERN DISTRICT OF CALIFORNIA**

12
    SANDISK CORPORATION,                    Case No. 5:25-cv-02389-PCP
13
                    Plaintiff,              **DEFENDANTS' AMENDED**
14                                          **COUNTERCLAIMS AND**
    vs.                                     **CROSSCLAIMS FOR PATENT**
15                                          **INFRINGEMENT**

16  IPVALUE MANAGEMENT, INC., and
    LONGITUDE FLASH MEMORY                  **JURY TRIAL DEMANDED**
17  SOLUTIONS LTD.,

18                  Defendants.

19

20

21

22

23

24

25

26

27

28

RUSS, AUGUST & KABAT

Defendants IPValue Management, Inc. ("IPValue") and Longitude Flash Memory Solutions Ltd. ("LFMS," and collectively with IPValue "Defendants" and "Counterclaim Plaintiffs") respectfully submit these Amended Counterclaims and Crossclaims for Patent Infringement to the Complaint for Declaratory Judgment of Patent Infringement ("Complaint") filed by Plaintiff Sandisk Corporation ("Sandisk").

### <u>DEFENDANTS' AMENDED COUNTERCLAIMS AND CROSSCLAIMS</u>

Pursuant to Rule 13 of the Federal Rules of Civil Procedure, Counterclaim Plaintiffs assert the following amended counterclaims and crossclaims against counterclaim defendant Sandisk, crossclaim defendants Western Digital Corporation ("Western Digital") and Sandisk Technologies, Inc. ("Sandisk Technologies" and collectively with Sandisk and Western Digital the "Counterclaim Defendants"). In substance, these amended counterclaims and cross claims are the same claims as the Counterclaim Plaintiffs have asserted against the Counterclaim Defendants in *IPValue Management, Inc. v. Western Digital Corp.*, Case No. 8:25-cv-00119-MWF(DFMx), in the United States District Court for the Central District of California (the "Central District Action"). The Counterclaim Defendants moved to stay the Central District Action on the grounds that the Northern District of California would be a more convenient venue for the dispute between the Counterclaim Plaintiffs and Counterclaim Defendants concerning the Asserted Patents to be heard, and the Central District has granted that motion to stay.

The Parties in this Action have stipulated to add Sandisk Technologies as a Plaintiff and Counterclaim Defendant (Dkt. 67). The Court granted the Parties stipulation. (Dkt. 68).

These amended counterclaims and crossclaims are an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq.*, in which Counterclaim Plaintiffs IPValue and LFMS make the following allegations against Counterclaim Defendants:

### <u>INTRODUCTION</u>

1.    This complaint arises from Counterclaim Defendants' unlawful infringement of the following United States patents exclusively licensed as to the claims in this lawsuit by IPValue: U.S. Patent No. 8,633,537 ("'537 Patent"); U.S. Patent No. 9,929,240 ("'240 Patent"); U.S. Patent

RUSS, AUGUST & KABAT

No. 11,456,365 ("'365 Patent"); U.S. Patent No. 6,963,505 ("'505 Patent"); and U.S. Patent No. 7,671,664 ("'664 Patent") (collectively the "Asserted Patents").

2.      LFMS is an intellectual property and technology licensing company. LFMS's patent portfolio comprises over 472 active and pending patents worldwide, including approximately 301 active United States patents. LFMS acquired these patents and/or rights to assert them from Cypress Semiconductor, a well-known American semiconductor design and manufacturing company that was acquired by Infineon Technologies in 2020 for nearly $10 billion.[1] In some instances, Cypress acquired patent assets from other entities such as Spansion Israel Ltd. through acquisitions. The innovations in these patents have greatly enhanced the capabilities of computer systems, increased electronic device processing power and capabilities and improved the functioning of computer memory and storage devices.

3.      IPValue is a leader in intellectual property and technology licensing whose mission is to fuel innovation by working with leading technology enterprises to generate revenues from their IP portfolios. LFMS has provided IPValue  exclusive licenses to the Asserted Patents and the right to assert these patents against Counterclaim Defendants.

4.      Counterclaim Defendants have infringed and continue to infringe Counterclaim Plaintiffs' patents. Moreover, despite Counterclaim Plaintiffs notifying Western Digital of infringement—and despite Sandisk (1) being a successor-in-part to Western Digital, (2) being personally aware of such notification, and (3) being aware of Counterclaim Plaintiffs' lawsuit against Western Digital—Counterclaim Defendants have thus far refused to license those patents. Instead, they have continued to make, use, sell, offer to sell, and/or import Counterclaim Plaintiffs' intellectual property within the United States without Counterclaim Plaintiffs' permission. IPValue attempted to engage in licensing discussions with Western Digital for some time before initiating this action.  For example, a letter from IPValue to Western Digital dated March 26, 2021, informed Western Digital that its products containing 3D NAND Flash memory infringed numerous patents, including the '537 Patent, the '240 Patent, '505 Patent, and the '664 Patent. A

---

[1] *See* "Infineon snaps up San Jose's Cypress Semiconductor in $10B deal", *available at* https://www.bizjournals.com/sanjose/news/2019/06/03/infineon-snaps-up-san-jose-s-cypress-semiconductor.html.

2

RUSS, AUGUST & KABAT

further letter from IPValue to Western Digital dated February 10, 2023, informed Western Digital that its products containing 3D NAND Flash memory infringed additional patents, including the '365 Patent. IPValue had multiple meetings with Western Digital in 2022, 2023, and 2024 where it presented detailed evidence demonstrating that Western Digital's products infringed each of the Asserted Patents.  Nonetheless, Western Digital refused to take a license to these valuable patents. Unable to move forward with licensing discussions, IPValue had no other choice but to file this lawsuit.

## PARTIES

5.     IPValue is a Delaware corporation, having its principal place of business at 2880 Lakeside Dr., Ste. 320, Santa Clara, CA 95054.

6.     LFMS is a privately held company, having its principal place of business at Plaza 255 Suite 2A, Blanchardstown Corporate Park 2, Blanchardstown, Dublin 15, D15 YH6H.

7.     Western Digital is a Delaware corporation with a principal place of business at 5601 Great Oaks Parkway, San Jose, California, 95119. Western Digital, on information and belief, has designed and manufactured, among other things, solid state drives ("SSD"), hard drives ("HDD"), USB Flash Drives, Embedded Flash, Memory Cards, and other non-volatile memory-based storage, and it continues to design and manufacture at least HDDs, including OptiNAND HDDs. Western Digital may be served with process through its registered agent, the Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

8.     Sandisk is a Delaware corporation with a principal place of business at 951 Sandisk Drive, Milpitas, California, 95035. On information and belief, until February 21, 2025 Sandisk was a wholly-owned subsidiary of Western Digital. Sandisk, on information and belief, designs and manufactures, among other things, solid state drives ("SSD"), USB Flash Drives, Embedded Flash, Memory Cards, and other non-volatile memory-based storage. Sandisk may be served with process through its registered agent, the Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

9.     Sandisk Technologies is a Delaware corporation with a principal place of business at 951 Sandisk Drive, Milpitas, California, 95035. Sandisk Technologies, on information and

belief, designs and manufactures, among other things, solid state drives ("SSD"), USB Flash Drives, Embedded Flash, Memory Cards, and other non-volatile memory-based storage. On information and belief, Sandisk Technologies is a wholly owned subsidiary of Sandisk, has assumed all activities in the United States in connection with the Accused Products, and represents that it has assumed all liability associated with the alleged past infringement of the Asserted Patents by Western Digital. Sandisk Technologies may be served with process through its registered agent, the Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808.

## JURISDICTION AND VENUE

10.     This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

11.     This Court has personal jurisdiction over Counterclaim Defendants in this action because Counterclaim Defendants have committed acts within this District giving rise to this action and have established minimum contacts with this forum such that the exercise of jurisdiction over Counterclaim Defendants would not offend traditional notions of fair play and substantial justice. Counterclaim Defendants, directly and through subsidiaries or intermediaries, have committed and continue to commit acts of infringement in this District by, among other things, importing, offering to sell, and selling products that infringe the asserted patents. Moreover, Sandisk has consented to personal jurisdiction in this District by bringing its complaint for declaratory judgment of non-infringement of the Asserted Patents. Counterclaim Defendants have consented to personal jurisdiction in this District by arguing in their motion to stay the Central District Action that this District would be a more convenient venue for the dispute between the Counterclaim Plaintiffs and Counterclaim Defendants concerning the Asserted Patents to be heard.

12.     Venue is proper in this District under 28 U.S.C. § 1400(b). Upon information and belief, Counterclaim Defendants have transacted business in this District and have committed acts of direct and indirect infringement in this District by, among other things, making, using, offering to sell, selling, and importing products that infringe the asserted patents. Counterclaim Defendants each have at least one regular and established place of business in the District. Moreover, Sandisk

has consented to venue in this District by bringing its complaint for declaratory judgment of non-infringement of the Asserted Patents. Counterclaim Defendants have consented to venue in this District by arguing in their motion to stay the Central District Action that this District would be a more convenient venue for the dispute between the Counterclaim Plaintiffs and Counterclaim Defendants concerning the Asserted Patents to be heard.

## COUNTERCLAIM DEFENDANTS' PRE-SUIT KNOWLEDGE OF ITS INFRINGEMENT OF COUNTERCLAIM PLAINTIFFS' PATENTS

13.    Counterclaim Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

14.    Before filing this action, LFMS, through its agent IPValue, notified Counterclaim Defendant Western Digital about the Asserted Patents and its infringement thereof. Among other things, IPValue identified the Asserted Patents to Western Digital in multiple communications from 2021–2024; alleged that Western Digital infringed the Asserted Patents, including identifying exemplary infringing products; sought to engage Western Digital in discussions regarding its use of Counterclaim Plaintiffs' intellectual property (including the Asserted Patents); and offered to license the Asserted Patents to Western Digital.

15.    For example, on March 26, 2021, IPValue sent a letter to Western Digital, notifying Western Digital of its infringement of certain of Counterclaim Plaintiffs' patents, including the '537 Patent, the '240 Patent, '505 Patent, and the '664 Patent. On February 10, 2023, IPValue sent a further letter to Western Digital, notifying Western Digital of its infringement of additional patents of Counterclaim Plaintiffs, including the '365 Patent. In each letter, IPValue specifically identified Western Digital's products using 3D NAND Flash memory as exemplary infringing products.

16.    IPValue also conducted multiple in-person and video meetings with Western Digital about licensing Counterclaim Plaintiffs' patents, including on May 24, 2022, August 24–25, 2022, November 17, 2022, February 8, 2023, June 21, 2023, September 26–27, 2023, and November 1, 2023. During the August 24–25, 2022, meetings, IPValue provided Western Digital with detailed evidence that its products infringe the '537 Patent, the '240 Patent, the '505 Patent,

RUSS, AUGUST & KABAT

and the '664 Patent. During the November 1, 2023 meeting, IPValue provided Western Digital with detailed evidence that its products infringe the '365 Patent.

17.    As a successor-in-part to Western Digital, Sandisk has had knowledge of its infringement of the Asserted Patents for as long as Western Digital has had knowledge of infringement. At a minimum, Sandisk has had such knowledge since its existence as a separate entity due to the prior notice to Western Digital before Sandisk was spun out as a separate entity. On March 7, 2025, Sandisk filed a complaint for declaratory judgment of noninfringement as to each of the Asserted Patents, confirming that Sandisk was aware of Counterclaim Plaintiffs' allegations that its products infringed the Asserted Patents.

18.    Despite Counterclaim Plaintiffs' repeated efforts, which have continued for nearly four years, Counterclaim Defendants have refused to license the Asserted Patents and have also not taken steps to end their infringement of the Asserted Patents. Instead, Counterclaim Defendants continue to knowingly, intentionally, and willfully infringe Counterclaim Plaintiffs' patents directly, contributorily, and by inducement, to obtain their significant benefits without a license from Counterclaim Plaintiffs.

## COUNT I

## INFRINGEMENT OF U.S. PATENT NO. 8,633,537

19.    Counterclaim Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

20.    LFMS is the owner and assignee of United States Patent No. 8,633,537 titled "Memory transistor with multiple charge storing layers and a high work function gate electrode." IPValue has the exclusive right to license the '537 Patent to Counterclaim Defendants and possesses substantial rights including the right to enforce the patent against Counterclaim Defendants. The '537 Patent was duly and legally issued by the United States Patent and Trademark Office on January 21, 2014. A true and correct copy of the '537 Patent is attached as Exhibit 1.

21.    Counterclaim Defendant Western Digital has known of the '537 Patent and its infringement of that patent since at least as early as March 26, 2021. On information and belief,

6

Counterclaim Defendant Sandisk—as successor-in-part to Western Digital and by and through its officers and employees—has known of the '537 Patent and that Sandisk's products infringe that patent since at least as early as March 26, 2021.

22.    Counterclaim Defendants, knowing their products infringe the '537 Patent and with the specific intent for others to infringe the '537 Patent, have directly infringed (literally and equivalently) and induced and contributed to infringement by others of the '537 Patent by making, using, offering for sale, selling, and/or importing into the United States certain products and services that directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '537 Patent, and continue to do so. By way of illustrative example, these infringing products and services include, without limitation, Counterclaim Defendants' SSDs, OptiNAND HDDs, USB Flash Drives, Embedded Flash, and Memory Cards containing 3D NAND flash memory, and all versions and variations thereof since the issuance of the '537 Patent ("Accused Products").

23.    Counterclaim Defendants have also infringed, and continue to infringe, claims of the '537 Patent by offering to commercially distribute, commercially distributing, making, and/or importing the Accused Products, which are used in practicing the process, or using the systems, of the patent, and constitute a material part of the invention. Counterclaim Defendants know the components in the Accused Products to be especially made or especially adapted for use in infringement of the patent, not a staple article, and not a commodity of commerce suitable for substantial noninfringing use. Accordingly, Counterclaim Defendants have been, and currently are, contributorily infringing the '537 Patent, in violation of 35 U.S.C. § 271(c).

24.    Counterclaim Plaintiffs have complied with 35 U.S.C. § 287. At a minimum, Counterclaim Plaintiffs provided Counterclaim Defendants with pre-suit notice of infringement of the '537 Patent no later than March 26, 2021.

25.    Counterclaim Plaintiffs have sustained and are entitled to recover damages as a result of Counterclaim Defendants' infringement.

26.    As described above, Counterclaim Defendants' infringement of the '537 Patent has been knowing, deliberate, and willful, since at least as early as March 26, 2021, the date of IPValue's first letter to Western Digital and therefore the latest possible date on which Western

7

Digital knew of the '537 Patent and that its conduct constituted and resulted in infringement of the '537 Patent. IPValue again identified the '537 Patent and Counterclaim Defendants' infringement thereof several times thereafter, as described above, and also including through this Complaint. Counterclaim Defendants nonetheless have committed acts of direct and indirect infringement despite knowing that their actions constituted infringement of the valid and enforceable '537 Patent, despite a risk of infringement that was known or so obvious that it should have been known to Counterclaim Defendants, and/or even though Counterclaim Defendants otherwise knew or should have known that their actions constituted an unjustifiably high risk of infringement of that valid and enforceable patent. Counterclaim Defendants' conduct in light of these circumstances is egregious. Counterclaim Defendants' knowing, deliberate, and willful infringement of the '537 Patent entitles Counterclaim Plaintiffs to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

27.     The Accused Products satisfy all claim limitations of one or more claims of the '537 Patent. For example, the Accused Products infringe claim 17 of the '537 Patent. One, non-limiting, example of the Accused Products infringement is presented below.

28.     The Accused Products include "a semiconductor device" comprising "a memory transistor." For example, the following image is from a scanning electron microscope ("SEM") cross section of an accused 96-layer (96L) 3D NAND Flash Memory device. It shows a semiconductor substrate ("Si substrate") and the structures labeled "55 gates" and "54 gates" are gates of memory transistors:

RUSS, AUGUST & KABAT



29.     In the Accused Products, the memory transistor includes "a vertical channel comprising polysilicon extending from a first diffusion region formed on a surface on a substrate to a second diffusion region formed over the surface of the substrate, the vertical channel electrically connecting the first diffusion region to the second diffusion region." For example, the above SEM image shows vertical channels (labeled thusly). The following two images are from transmission electron microscope ("TEM") cross sections of an accused 96L 3D NAND Flash Memory device. They show that the vertical channels comprise polysilicon ("poly-Si"). A first diffusion region is formed on a surface on a substrate ("Si substrate" above and lower half of bottom image below). A second diffusion region is formed over the surface of the substrate ("poly-Si cap" in top image below). The vertical channel electrically connects the first and second diffusion regions:





30.     In the Accused Products, the memory transistor includes "an oxide-nitride-nitride-oxide (ONNO) stack disposed about the vertical channel." For example, the first image below is from a TEM cross section of an accused 96L 3D NAND Flash Memory device. The second image below adds color highlighting to the ring structures to assist in describing the structure. The red ring ("Si Channel") is a cross section of the vertical channel. The yellow, purple, and green layers make up an oxide-nitride-nitride-oxide (ONNO) stack disposed about the vertical channel:



10



31.    In the Accused Products, the ONNO stack includes "a tunnel dielectric layer abutting the vertical channel." For example, the yellow ring is a silicon oxide tunnel dielectric layer abutting the red vertical channel layer:



RUSS, AUGUST & KABAT

32.     In the Accused Products, the ONNO stack includes "a multi-layer charge-trapping region including a first nitride layer comprising an oxygen-rich nitride abutting the tunnel dielectric layer, and a second nitride layer comprising a silicon-rich, oxygen-lean nitride overlying the first nitride layer." For example, the purple rings are a multi-layer charge trapping layer comprising two dielectric layers containing silicon, oxygen, and nitrogen, indicated by the two different shades of purple. In the unhighlighted image, it is apparent that the charge trap layer contains at least two sublayers, including a lighter-colored inner layer and darker-colored outer layer. The different shades of the sublayers indicate that they have different chemical compositions. The lighter shade of the inner sublayer abutting the yellow tunnel dielectric layer is closer in shade to the silicon oxide materials of the tunnel dielectric and blocking dielectric layers, indicating that this inner sublayer includes oxygen-rich nitride and the outer sublayer includes oxygen-lean nitride:



33.     In the Accused Products, the ONNO stack includes "a blocking dielectric layer overlying the multi-layer charge-trapping region." For example, the green ring is a silicon oxide blocking dielectric layer overlying the purple multi-layer charge-trapping region:



34.     In the Accused Products, the memory transistor includes "a high work function gate electrode disposed about the ONONO stack, abutting the blocking dielectric layer." For example, the following image is from a transmission electron microscope ("TEM") cross section of an accused 96L 3D NAND Flash Memory device. Gate electrodes are formed from tungsten ("W"), a high work function material, and the gate electrodes abut the blocking dielectric layer:



**COUNT II**

**INFRINGEMENT OF U.S. PATENT NO. 9,929,240**

35.     Counterclaim Plaintiffs reallege and incorporate by reference the foregoing

RUSS, AUGUST & KABAT

paragraphs as if fully set forth herein.

36.    LFMS is the owner and assignee of United States Patent No. 9,929,240 titled "Memory transistor with multiple charge storing layers and a high work function gate electrode." IPValue has the exclusive right to license the '240 Patent to Counterclaim Defendants and possesses substantial rights including the right to enforce the patent against Counterclaim Defendants. The '240 Patent was duly and legally issued by the United States Patent and Trademark Office on March 27, 2018. A true and correct copy of the '240 Patent is attached as Exhibit 2.

37.    Counterclaim Defendant Western Digital has known of the '240 Patent and its infringement of that patent since at least as early as March 26, 2021. On information and belief, Counterclaim Defendant Sandisk—as successor-in-part to Western Digital and by and through its officers and employees—has known of the '240 Patent and that Sandisk's products infringe that patent since at least as early as March 26, 2021.

38.    Counterclaim Defendants, knowing their products infringe the '240 Patent and with the specific intent for others to infringe the '240 Patent, have directly infringed (literally and equivalently) and induced and contributed to infringement by others of the '240 Patent by making, using, offering for sale, selling, and/or importing into the United States certain products and services that directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '240 Patent, and continue to do so. By way of illustrative example, these infringing products and services include, without limitation, Counterclaim Defendants' SSDs, OptiNAND HDDs, USB Flash Drives,  Embedded Flash, and Memory Cards containing 3D NAND flash memory, and all versions and variations thereof since the issuance of the '240 Patent ("Accused Products").

39.    Counterclaim Defendants have also infringed, and continue to infringe, claims of the '240 Patent by offering to commercially distribute, commercially distributing, making, and/or importing the Accused Products, which are used in practicing the process, or using the systems, of the patent, and constitute a material part of the invention. Counterclaim Defendants know the components in the Accused Products to be especially made or especially adapted for use in infringement of the patent, not a staple article, and not a commodity of commerce suitable for

RUSS, AUGUST & KABAT

14

substantial noninfringing use. Accordingly, Counterclaim Defendants have been, and currently are, contributorily infringing the '240 Patent, in violation of 35 U.S.C. § 271(c).

40.    Counterclaim Plaintiffs have complied with 35 U.S.C. § 287. At a minimum, Counterclaim Plaintiffs provided Counterclaim Defendants with pre-suit notice of infringement of the '240 Patent no later than March 26, 2021.

41.    Counterclaim Plaintiffs have sustained and are entitled to recover damages as a result of Counterclaim Defendants' infringement.

42.    As described above, Counterclaim Defendants' infringement of the '240 Patent has been knowing, deliberate, and willful, since at least as early as March 26, 2021, the date of IPValue's first letter to Western Digital and therefore the latest possible date on which Western Digital knew of the '240 Patent and that its conduct constituted and resulted in infringement of the '240 Patent. IPValue again identified the '240 Patent and Counterclaim Defendants' infringement thereof several times thereafter, as described above, and also including through this Complaint. Counterclaim Defendants nonetheless have committed acts of direct and indirect infringement despite knowing that their actions constituted infringement of the valid and enforceable '240 Patent, despite a risk of infringement that was known or so obvious that it should have been known to Counterclaim Defendants, and/or even though Counterclaim Defendants otherwise knew or should have known that their actions constituted an unjustifiably high risk of infringement of that valid and enforceable patent. Counterclaim Defendants' conduct in light of these circumstances is egregious. Counterclaim Defendants' knowing, deliberate, and willful infringement of the '240 Patent entitles Counterclaim Plaintiffs to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

43.    The Accused Products satisfy all claim limitations of one or more claims of the '240 Patent. For example, the Accused Products infringe claim 12 of the '240 Patent. One, non-limiting, example of the Accused Products infringement is presented below.

44.    The Accused Products include "a semiconductor device" comprising "a memory device." For example, the following image is from an SEM cross section of an accused 96-layer (96L) 3D NAND Flash Memory device. It shows a semiconductor substrate ("Si substrate"):

RUSS, AUGUST & KABAT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS, AUGUST & KABAT



45.    In the Accused Products, the memory device includes "a gate structure including a first high work function gate electrode." For example, the following image is from a TEM cross section of an accused 96L 3D NAND Flash Memory device. Gate structures include gate electrodes formed from tungsten ("W"), a high work function material:



46.    In the Accused Products, the memory device includes "a channel positioned between and electrically connecting a first diffusion region and a second diffusion region, wherein the channel is vertical and oriented substantially perpendicular to a semiconductor material structure." For example, the above SEM image shows vertical channels (labeled thusly) oriented perpendicular to the semiconductor substrate ("Si substrate"). The following two images are from transmission electron microscope ("TEM") cross sections of an accused 96L 3D NAND Flash Memory device. A first diffusion region is formed on a surface on a substrate ("Si substrate" above

and lower half of bottom image below). A second diffusion region is formed over the surface of the substrate ("poly-Si cap" in top image below). The vertical channel is positioned between and electrically connects the first and second diffusion regions:





47.    In the Accused Products, the memory device includes "a tunnel dielectric layer, a multi-layer charge trapping layer, and a blocking dielectric layer disposed between the gate structure and the channel, wherein the multi-layer charge trapping layer comprises a first dielectric layer disposed abutting a second dielectric layer, wherein the first dielectric layer includes oxygen-rich nitride and the second dielectric layer includes oxygen-lean nitride." For example, the first image below is from a TEM cross section of an accused 96L 3D NAND Flash Memory device. The second image below adds color highlighting to the ring structures to assist in describing the structure. The yellow ring is a silicon oxide tunnel dielectric layer. The green ring is a silicon oxide

RUSS, AUGUST & KABAT

blocking dielectric layer. The purple rings are a multi-layer charge trapping layer comprising two dielectric layers containing silicon, oxygen, and nitrogen, indicated by the two different shades of purple. In the unhighlighted image, it is apparent that the charge trap layer contains at least two sublayers, including a lighter-colored inner layer and darker-colored outer layer. The different shades of the sublayers indicate that they have different chemical compositions. The lighter shade of the inner sublayer is closer in shade to the silicon oxide materials of the tunnel dielectric and blocking dielectric layers, indicating that this inner sublayer includes oxygen-rich nitride and the outer sublayer includes oxygen-lean nitride:





48. In the Accused Products, the memory device includes "a metal oxide semiconductor (MOS) logic device including a gate oxide layer and a second high work function gate electrode disposed thereon." For example, the SEM image below shows seven logic transistors (bottom half of image) with gate electrodes (black rectangles) formed of a high work function material such as tungsten and gate oxide layers (white):



1

2

3

4

5

6

7

8

9

10

11

RUSS, AUGUST & KABAT

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT III

## INFRINGEMENT OF U.S. PATENT NO. 11,456,365

49.     Counterclaim Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

50.     LFMS is the owner and assignee of United States Patent No. 11,456,365 titled "Memory transistor with multiple charge storing layers and a high work function gate electrode." IPValue has the exclusive right to license the '365 Patent to Counterclaim Defendants and possesses substantial rights including the right to enforce the patent against Counterclaim Defendants. The '365 Patent was duly and legally issued by the United States Patent and Trademark Office on September 27, 2022. A true and correct copy of the '365 Patent is attached as Exhibit 3.

51.     Counterclaim Defendant Western Digital has known of the '365 Patent and its infringement of that patent since at least as early as February 10, 2023. On information and belief, Counterclaim Defendant Sandisk—as successor-in-part to Western Digital and by and through its officers and employees—has known of the '365 Patent and that Sandisk's products infringe that patent since at least as early as February 10, 2023.

52.     Counterclaim Defendants, knowing their products infringe the '365 Patent and with the specific intent for others to infringe the '365 Patent, have directly infringed (literally and equivalently) and induced and contributed to infringement by others of the '365 Patent by making, using, offering for sale, selling, and/or importing into the United States certain products and services that directly infringe and/or were made by a patented process, literally and/or under the doctrine of equivalents, one or more claims of the '365 Patent, and continue to do so. By way of illustrative example, these infringing products and services include, without limitation, Counterclaim Defendants' SSDs, OptiNAND HDDs, USB Flash Drives, Embedded Flash, and Memory Cards containing 3D NAND flash memory, and all versions and variations thereof since the issuance of the '365 Patent ("Accused Products").

53.     Counterclaim Defendants have also infringed, and continue to infringe, claims of the '365 Patent by offering to commercially distribute, commercially distributing, making, and/or

importing the Accused Products, which are used in practicing the process, or using the systems, of the patent, and constitute a material part of the invention. Counterclaim Defendants know the components in the Accused Products to be especially made or especially adapted for use in infringement of the patent, not a staple article, and not a commodity of commerce suitable for substantial noninfringing use. Accordingly, Counterclaim Defendants have been, and currently are, contributorily infringing the '365 Patent, in violation of 35 U.S.C. § 271(c).

54.    Counterclaim Plaintiffs have complied with 35 U.S.C. § 287. At a minimum, Counterclaim Plaintiffs provided Counterclaim Defendants with pre-suit notice of infringement of the '365 Patent no later than February 10, 2023.

55.    Counterclaim Plaintiffs have sustained and are entitled to recover damages as a result of Counterclaim Defendants' infringement.

56.    As described above, Counterclaim Defendants' infringement of the '365 Patent has been knowing, deliberate, and willful, since at least as early as February 10, 2023, the date of IPValue's first letter to Western Digital and therefore the latest possible date on which Western Digital knew of the '365 Patent and that its conduct constituted and resulted in infringement of the '365 Patent. IPValue again identified the '365 Patent and Counterclaim Defendants' infringement thereof several times thereafter, as described above, and also including through this Complaint. Counterclaim Defendants nonetheless have committed acts of direct and indirect infringement despite knowing that their actions constituted infringement of the valid and enforceable '365 Patent, despite a risk of infringement that was known or so obvious that it should have been known to Counterclaim Defendants, and/or even though Counterclaim Defendants otherwise knew or should have known that their actions constituted an unjustifiably high risk of infringement of that valid and enforceable patent. Counterclaim Defendants' conduct in light of these circumstances is egregious. Counterclaim Defendants' knowing, deliberate, and willful infringement of the '365 Patent entitles Counterclaim Plaintiffs to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

57.    The Accused Products satisfy all claim limitations of one or more claims of the '365 Patent. For example, the Accused Products infringe claim 35 of the '365 Patent. One, non-

limiting, example of the Accused Products infringement is presented below.

58.    The Accused Products include a "semiconductor memory device" that includes "a semiconductor substrate." For example, the following image is from an SEM cross section of an accused 96-layer (96L) 3D NAND Flash Memory device. It shows a semiconductor substrate ("Si substrate"):



59.    In the Accused Products, the semiconductor memory device includes "a channel region oriented substantially perpendicular to the semiconductor substrate, the channel region formed in a substantially annular shape." For example, the above SEM image shows vertical channels (labeled thusly) oriented perpendicular to the semiconductor substrate ("Si substrate").

RUSS, AUGUST & KABAT

RUSS, AUGUST & KABAT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



60.    In the Accused Products, the semiconductor memory device includes "a tunnel dielectric layer surrounding the channel region, the tunnel dielectric layer formed in a substantially annular shape." For example, the yellow ring is a silicon oxide tunnel dielectric layer surrounding

the red channel region:



61.    In the Accused Products, the semiconductor memory device includes "a multi-layer charge storing region surrounding the tunnel dielectric layer, the multi-layer charge storing region formed in a substantially annular shape." For example, the purple rings are a multi-layer charge trapping layer comprising two dielectric layers containing silicon, oxygen, and nitrogen, indicated by the two different shades of purple. The purple rings collectively have a substantially annular shape and surround the yellow tunnel dielectric layer:



62.    In the Accused Products, the semiconductor memory device includes "a blocking dielectric layer surrounding the multi-layer charge storing region, the blocking dielectric layer formed in a substantially annular shape." For example, the green ring is a silicon oxide blocking dielectric layer surrounding the purple multi-layer charge-trapping region:



63.    In the Accused Products, the semiconductor memory device includes "a gate electrode surrounding the blocking dielectric layer." For example, the following image is from a TEM cross section of an accused 96L 3D NAND Flash Memory device. Gate electrodes surround the blocking dielectric layer:



## COUNT IV

## INFRINGEMENT OF U.S. PATENT NO. 6,963,505

64.    Counterclaim Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

26

65.    IPValue has the exclusive right to license United States Patent No. 6,963,505 titled "Method circuit and system for determining a reference voltage" to Counterclaim Defendants and possesses substantial rights including the right to enforce the patent against Counterclaim Defendants. The '505 Patent was duly and legally issued by the United States Patent and Trademark Office on November 8, 2005. A true and correct copy of the '505 Patent is attached as Exhibit 4.

66.    Counterclaim Defendant Western Digital has known of the '505 Patent and its infringement of that patent since at least as early as March 26, 2021. On information and belief, Counterclaim Defendant Sandisk—as successor-in-part to Western Digital and by and through its officers and employees—has known of the '505 Patent and that Sandisk's products infringe that patent since at least as early as March 26, 2021.

67.    Counterclaim Defendants, knowing their products infringe the '505 Patent and with the specific intent for others to infringe the '505 Patent, have directly infringed (literally and equivalently) and induced and contributed to infringement by others of the '505 Patent by making, using, offering for sale, selling, and/or importing into the United States certain products and services that directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '505 Patent, and continue to do so. By way of illustrative example, these infringing products and services include, without limitation, Counterclaim Defendants' SSDs, OptiNAND HDDs, USB Flash Drives, Embedded Flash, and Memory Cards containing 3D NAND flash memory, and all versions and variations thereof since the issuance of the '505 Patent ("Accused Products").

68.    Counterclaim Defendants have also infringed, and continue to infringe, claims of the '505 Patent by offering to commercially distribute, commercially distributing, making, and/or importing the Accused Products, which are used in practicing the process, or using the systems, of the patent, and constitute a material part of the invention. Counterclaim Defendants know the components in the Accused Products to be especially made or especially adapted for use in infringement of the patent, not a staple article, and not a commodity of commerce suitable for substantial noninfringing use. Accordingly, Counterclaim Defendants have been, and currently are, contributorily infringing the '505 Patent, in violation of 35 U.S.C. § 271(c).

69.     Counterclaim Plaintiffs have complied with 35 U.S.C. § 287. At a minimum, Counterclaim Plaintiffs provided Counterclaim Defendants with pre-suit notice of infringement of the '505 Patent no later than March 26, 2021.

70.     Counterclaim Plaintiffs have sustained and are entitled to recover damages as a result of Counterclaim Defendants' infringement.

71.     As described above, Counterclaim Defendants' infringement of the '505 Patent has been knowing, deliberate, and willful, since at least as early as March 26, 2021, the date of IPValue's first letter to Western Digital and therefore the latest possible date on which Western Digital knew of the '505 Patent and that its conduct constituted and resulted in infringement of the '505 Patent. IPValue again identified the '505 Patent and Counterclaim Defendants' infringement thereof several times thereafter, as described above, and also including through this Complaint. Counterclaim Defendants nonetheless have committed acts of direct and indirect infringement despite knowing that their actions constituted infringement of the valid and enforceable '505 Patent, despite a risk of infringement that was known or so obvious that it should have been known to Counterclaim Defendants, and/or even though Counterclaim Defendants otherwise knew or should have known that their actions constituted an unjustifiably high risk of infringement of that valid and enforceable patent. Counterclaim Defendants' conduct in light of these circumstances is egregious. Counterclaim Defendants' knowing, deliberate, and willful infringement of the '505 Patent entitles Counterclaim Plaintiffs to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

72.     The Accused Products satisfy all claim limitations of one or more claims of the '505 Patent. For example, the Accused Products infringe claim 1 of the '505 Patent. One, non-limiting, example of the Accused Products infringement is presented below.

73.     In or about 2000, Toshiba Corporation and the then-Sandisk Corporation formed a joint venture (the "Toshiba/SanDisk Joint Venture") to develop and manufacture flash-memory chips. The Sandisk Corporation entity that formed the joint venture was acquired by Western Digital in 2016 and is a distinct legal entity from the Sandisk Corporation that is a defendant to this action. On information and belief, some or all of the Accused Products contain flash memory

and/or controller chips manufactured by the Toshiba/SanDisk Joint Venture.

74.    At the International Solid-State Circuits Conference (ISSCC) 2018, held February 11–15, 2018 authors affiliated with the Toshiba/SanDisk Joint Venture presented a paper titled "A 512Gb 3b/Cell 3D flash memory on a 96-word-line-layer technology" (the "ISSCC 2018 96L Paper"):

### ISSCC 2018 / SESSION 20 / FLASH-MEMORY SOLUTI

#### 20.1    A 512Gb 3b/Cell 3D Flash Memory on a 96-Word-Line-Layer Technology

Hiroshi Maejima[1], Kazushige Kanda[1], Susumu Fujimura[1], Teruo Takagiwa[1], Susumu Ozawa[1], Jumpei Sato[1], Yoshihiko Shindo[1], Manabu Sato[1], Naoaki Kanagawa[1], Junji Musha[1], Satoshi Inoue[1], Katsuaki Sakurai[1], Naohito Morozumi[1], Ryo Fukuda[1], Yuui Shimizu[1], Toshifumi Hashimoto[1], Xu Li[1], Yuuki Shimizu[1], Kenichi Abe[1], Tadashi Yasufuku[1], Takatoshi Minamoto[1], Hiroshi Yoshihara[1], Takahiro Yamashita[1], Kazuhiko Satou[2], Takahiro Sugimoto[1], Fumihiro Kono[1], Mitsuhiro Abe[1], Tomoharu Hashiguchi[1], Masatsugu Kojima[1], Yasuhiro Suematsu[2], Takahiro Shimizu[1], Akihiro Imamoto[1], Naoki Kobayashi[1], Makoto Miakashi[1], Kouichirou Yamaguchi[1], Sanad Bushnaq[1], Hicham Haibi[1], Masatsugu Ogawa[1], Yusuke Ochi[1], Kenro Kubota[2], Taichi Wakui[2], Dong He[3], Weihan Wang[3], Hiroe Minagawa[1], Tomoko Nishiuchi[1], Hao Nguyen[3], Kwang-Ho Kim[3], Ken Cheah[3], Yee Koh[3], Feng Lu[3], Venky Ramachandra[3], Srinivas Rajendra[3], Steve Choi[3], Keyur Payak[3], Namas Raghunathan[3], Spiros Georgakis[3], Hiroshi Sugawara[3], Seungpil Lee[3], Takuya Futatsuyama[1], Koji Hosono[1], Noboru Shibata[1], Toshiki Hisada[1], Tetsuya Kaneko[1], Hiroshi Nakamura[1]

[1]Toshiba Memory, Yokohama, Japan
[2]Toshiba Memory Systems, Yokohama, Japan; [3]SanDisk, Milpitas, CA

The first multi-layer stacked 3D Flash memory was proposed as BiCS FLASH in 2007 [1]. Since then, memory bit density has grown rapidly due to the increase in the number of stacked layers from continuous 3D technology innovations. On the other hand, the multi-level-cell technology, which was initially proposed for 2D Flash, has also been adopted to 3D Flash memories. The first 3b/cell 32-layer Flash was presented in 2015 [2], followed by a 48-layer one in 2016 [3], and a 64-layer one in 2017 [4,5]. This paper describes a 512Gb 3b/cell 3D Flash memory in a 96-word-line-layer BiCS FLASH technology. This work implements three key technologies to improve performance: (1) a string based start bias control scheme achieves a 7% shorter program time; (2) a smart $V_t$-tracking read improves read retry performance by minimizing the tracking time and supporting a program suspend read function, and; (3) a low-pre-charge sense-amplifier bus scheme reduces both the power consumption and the data-transfer time between the sense amplifier (SA) and the data cache by half. Figure 20.1.1 shows the die micrograph and the summary of the key features of the chip.

Source: SanDisk/WD-Toshiba, Paper 20.1, ISSCC 2018, "A 512Gb 3b/Cell Flash Memory on a 96-Word-Line-Layer Technology."

75.    According to the 2018 website of the ISSCC, "The International Solid-State

29

Circuits Conference is the foremost global forum for presentation of advances in solid-state circuits and systems-on-a-chip. The Conference offers a unique opportunity for engineers working at the cutting edge of IC design and application to maintain technical currency, and to network with leading experts." (https://web.archive.org/web/20180227043804/http://isscc.org/about-isscc/). According to a trade publication, "The ISSCC event is the second event of each new year, following the Consumer Electronics Show, where new PC processors and sundry other computing gadgets are brought to market." (https://www.theregister.com/2010/12/01/isscc_2011_chip_preview/). The first 96-layer 3D NAND Flash memory made by the Toshiba/SanDisk Joint Venture was commercially released in July 2018. (https://americas.kioxia.com/en-ca/business/news/2018/ssd-20180723-1.html).

76.     The large number of Toshiba and SanDisk engineers listed as authors on the ISSCC 2018 96L Paper indicates that they were working on a technology that was being developed for commercial sale, not merely a research project. The timing of the paper approximately 5 months before commercial announcement of Toshiba/SanDisk 96L memories and the recognized status of the ISSCC conference as a place for products to be brought to market indicates that the ISSCC 2018 96L Paper describes technology developed to be used in the 96L products first sold later in 2018.

77.     Certain of the Accused Products utilize 96L or 112L 3D NAND Flash memory. These 96L and 112L Accused Products utilize memory developed by the Toshiba/SanDisk Joint Venture and controllers developed by Western Digital in collaboration with the Toshiba/SanDisk Joint Venture:

RUSS, AUGUST & KABAT

| WD Blue SN550 SSD Specifications | | | |
|---|---|---|---|
| **Capacity** | **250 GB** | **500 GB** | **1 TB** |
| Form Factor | M.2 2280 PCIe 3.0 x4 | | |
| Controller | WD in-house | | |
| DRAM | None | | |
| NAND Flash | Western Digital/SanDisk 96L 3D TLC | | |
| Sequential Read | 2400 MB/s | 2400 MB/s | 2400 MB/s |
| Sequential Write | 950 MB/s | 1750 MB/s | 1950 MB/s |
| Random Read | 170k IOPS | 300k IOPS | 410k IOPS |
| Random Write | 135k IOPS | 240k IOPS | 405k IOPS |
| Warranty | 5 years | | |
| Write Endurance | 150 TB 0.3 DWPD | 300 TB 0.3 DWPD | 600 TB 0.3 DWPD |
| MSRP | $54.99 | $64.99 | $99.99 |

Source: https://www.anandtech.com/show/15214/western-digital-announces-wd-blue-sn550-ssd

78.    The ISSCC 2018 96L Paper describes techniques utilized in the operation of the 96L and/or 112L Accused Products. As a further example of the basis for this information and belief, during the August 24–25, 2022, meetings between the parties discussed above, IPValue provided Western Digital with evidence that its products infringed the '505 patent, based in part upon the ISSCC 2018 96L Paper. While Western Digital provided responses to IPValue concerning this patent in subsequent meetings, Western Digital never denied that the ISSCC 2018 96L Paper accurately described techniques utilized in its products.

79.    The Accused Products practice a "method of selecting a reference level from a set of possible reference levels," which includes "using each of said possible reference levels to read a set of cells from a memory area." For example, the ISSCC 2018 96L Paper describes using each of a set of possible threshold voltages $V_t$ as reference levels to read a set of cells from a memory area:

A key design challenge in recent years is enhancing the retry read performance of a 3D Flash memory. The valley tracking read [5] minimizes the BER by adaptively finding the optimal read voltage. We propose a smart $V_{th}$ tracking read (SVTR) to improve the retry read performance by reducing the number of tracking cycles, and to support a program-suspend read function. Figure 20.1.4 shows the SVTR waveform for a middle-page read. The read operation consists of two parts; (1) a $V_t$ tracking read (VTR), where the selected WL level moves from the MP1-state to the MP2-state, and then to the MP3-state. The optimal read voltage is to be tracked

for each state. The number of stages related to each state is parameterizable and the WL voltage step has enough resolution to guarantee the accuracy of VTR. A bit count operation is executed in parallel with VTR, and the bit whose $V_t$ is distributed between the read voltage of the $N^{th}$ stage read and $(N+1)^{th}$ stage read is counted concurrently with the $(N+2)^{th}$ stage read operation. VTR is used with a shielded-bitline current-sense (SBL) scheme [4], because SBL suppresses BL coupling noise thereby realizing a shorter read time [4]. The number of S/A latches in use is reduced by half in comparison with a conventional all bitline current sense (ABL) scheme. (2) A calibrating read (CALR), in which the optimal read voltage that is determined from the bit count result of the VTR is applied. A CALR is



Figure 20.1.4: Smart $V_t$ tracking read (SVTR) and high-state option.

Source: SanDisk/WD-Toshiba,  Paper 20.1, ISSCC 2018, A 512Gb 3b/Cell Flash Memory on a 96-Word-Line-Layer Technology

80.    In the Accused Products, the method includes "determining a read error rate for each one of said possible reference levels associated with the reading of said set of cells." For example, the ISSCC 2018 96L Paper describes determining a bit count at different values of the threshold voltage $V_t$, thereby determining a read error rate, and then finding an optimal Vt which has a minimized error bit count:

RUSS, AUGUST & KABAT

A key design challenge in recent years is enhancing the retry read performance of a 3D Flash memory. The valley tracking read [5] minimizes the BER by adaptively finding the optimal read voltage. We propose a smart $V_{th}$ tracking read (SVTR) to improve the retry read performance by reducing the number of tracking cycles, and to support a program-suspend read function. Figure 20.1.4 shows the SVTR waveform for a middle-page read. The read operation consists of two parts; (1) a $V_t$ tracking read (VTR), where the selected WL level moves from the MP1-state to the MP2-state, and then to the MP3-state. The optimal read voltage is to be tracked

for each state. The number of stages related to each state is parameterizable and the WL voltage step has enough resolution to guarantee the accuracy of VTR. A bit count operation is executed in parallel with VTR, and the bit whose $V_t$ is distributed between the read voltage of the $N^{th}$ stage read and $(N+1)^{th}$ stage read is counted concurrently with the $(N+2)^{th}$ stage read operation. VTR is used with a shielded-bitline current-sense (SBL) scheme [4], because SBL suppresses BL coupling noise thereby realizing a shorter read time [4]. The number of S/A latches in use is reduced by half in comparison with a conventional all bitline current sense (ABL) scheme. (2) A calibrating read (CALR), in which the optimal read voltage that is determined from the bit count result of the VTR is applied. A CALR is



Figure 20.1.4: Smart $V_t$ tracking read (SVTR) and high-state option.

Source: SanDisk/WD-Toshiba, Paper 20.1, ISSCC 2018, A 512Gb 3b/Cell Flash Memory on a 96-Word-Line-Layer Technology

81.    In the Accused Products, the method includes "selecting a reference level from said set of possible reference levels whose read error rate is relatively low." For example, the ISSCC 2018 96L Paper describes selecting a threshold voltage $V_t$ that gives the minimum error bit count, and thereby a read error rate that is relatively low:

RUSS, AUGUST & KABAT

A key design challenge in recent years is enhancing the retry read performance of a 3D Flash memory. The valley tracking read [5] minimizes the BER by adaptively finding the optimal read voltage. We propose a smart $V_{th}$ tracking read (SVTR) to improve the retry read performance by reducing the number of tracking cycles, and to support a program-suspend read function. Figure 20.1.4 shows the SVTR waveform for a middle-page read. The read operation consists of two parts; (1) a $V_t$ tracking read (VTR), where the selected WL level moves from the MP1-state to the MP2-state, and then to the MP3-state. The optimal read voltage is to be tracked

for each state. The number of stages related to each state is parameterizable and the WL voltage step has enough resolution to guarantee the accuracy of VTR. A bit count operation is executed in parallel with VTR, and the bit whose $V_t$ is distributed between the read voltage of the $N^{th}$ stage read and $(N+1)^{th}$ stage read is counted concurrently with the $(N+2)^{th}$ stage read operation. VTR is used with a shielded-bitline current-sense (SBL) scheme [4], because SBL suppresses BL coupling noise thereby realizing a shorter read time [4]. The number of S/A latches in use is reduced by half in comparison with a conventional all bitline current sense (ABL) scheme. (2) A calibrating read (CALR), in which the optimal read voltage that is determined from the bit count result of the VTR is applied. A CALR is



Figure 20.1.4: Smart $V_t$ tracking read (SVTR) and high-state option.

Source: SanDisk/WD-Toshiba,  Paper 20.1, ISSCC 2018, A 512Gb 3b/Cell Flash Memory on a 96-Word-Line-Layer Technology

## COUNT V

## INFRINGEMENT OF U.S. PATENT NO. 7,671,664

82.    Counterclaim Plaintiffs reallege and incorporate by reference the foregoing paragraphs as if fully set forth herein.

83.    LFMS is the owner and assignee of United States Patent No. 7,671,664 titled "Charge pump control circuit and method." IPValue has the exclusive right to license the '664 Patent to Counterclaim Defendants and possesses substantial rights including the right to enforce the patent against Counterclaim Defendants. The '664 Patent was duly and legally issued by the United States Patent and Trademark Office on March 2, 2010. A true and correct copy of the '664 Patent is attached as Exhibit 5.

84.    Counterclaim Defendant Western Digital has known of the '664 Patent and its infringement of that patent since at least as early as March 26, 2021. On information and belief, Counterclaim Defendant Sandisk—as successor-in-part to Western Digital and by and through its officers and employees—has known of the '664 Patent and that Sandisk's products infringe that patent since at least as early as March 26, 2021.

85.    Counterclaim Defendants, knowing their products infringe the '664 Patent and with the specific intent for others to infringe the '664 Patent, have directly infringed (literally and equivalently) and induced and contributed to infringement by others of the '664 Patent by making, using, offering for sale, selling, and/or importing into the United States certain products and services that directly infringe, literally and/or under the doctrine of equivalents, one or more claims of the '664 Patent, and continue to do so. By way of illustrative example, these infringing products and services include, without limitation, Counterclaim Defendants' SSDs, OptiNAND HDDs, USB Flash Drives, Embedded Flash, and Memory Cards containing 3D NAND flash memory, and all versions and variations thereof since the issuance of the '664 Patent ("Accused Products").

86.    Counterclaim Defendants have also infringed, and continue to infringe, claims of the '664 patent by offering to commercially distribute, commercially distributing, making, and/or importing the Accused Products, which are used in practicing the process, or using the systems, of the patent, and constitute a material part of the invention. Counterclaim Defendants know the components in the Accused Products to be especially made or especially adapted for use in infringement of the patent, not a staple article, and not a commodity of commerce suitable for substantial noninfringing use. Accordingly, Counterclaim Defendants have been, and currently are, contributorily infringing the '664 patent, in violation of 35 U.S.C. § 271(c).

RUSS, AUGUST & KABAT

87.    Counterclaim Plaintiffs have complied with 35 U.S.C. § 287. At a minimum, Counterclaim Plaintiffs provided Counterclaim Defendants with pre-suit notice of infringement of the '664 Patent no later than March 26, 2021.

88.    Counterclaim Plaintiffs have sustained and are entitled to recover damages as a result of Counterclaim Defendants' infringement.

89.    As described above, Counterclaim Defendants' infringement of the '664 Patent has been knowing, deliberate, and willful, since at least as early as March 26, 2021, the date of IPValue's first letter to Western Digital and therefore the latest possible date on which Western Digital knew of the '664 Patent and that its conduct constituted and resulted in infringement of the '664 Patent. IPValue again identified the '664 Patent and Counterclaim Defendants' infringement thereof several times thereafter, as described above, and also including through this Complaint. Counterclaim Defendants nonetheless have committed acts of direct and indirect infringement despite knowing that their actions constituted infringement of the valid and enforceable '664 Patent, despite a risk of infringement that was known or so obvious that it should have been known to Counterclaim Defendants, and/or even though Counterclaim Defendants otherwise knew or should have known that their actions constituted an unjustifiably high risk of infringement of that valid and enforceable patent. Counterclaim Defendants' conduct in light of these circumstances is egregious. Counterclaim Defendants' knowing, deliberate, and willful infringement of the '664 Patent entitles Counterclaim Plaintiffs to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

90.    The Accused Products satisfy all claim limitations of one or more claims of the '664 Patent. For example, the Accused Products infringe claim 1 of the '664 Patent. One, non-limiting, example of the Accused Products infringement is presented below.

91.    The Accused Products include "a charge pump control circuit" that includes "a clock control circuit configured to output a switch clock control signal based on a dynamic load." For example, the circuitry in the two blocks surrounded by red rectangles below is a "clock control circuit":

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

RUSS, AUGUST & KABAT



(Source: TechInsight Report Toshiba/Sandisk 96L 3D NAND Flash Circuit Analysis)

92.    The circuit outputs a signal B4629 which is a "switch clock control signal" that operates a multiplexer to switch between clock signals CLK1 and CLK2, as shown below:

37



(Source: TechInsight Report Toshiba/Sandisk 96L 3D NAND Flash Circuit Analysis)

93.    The clock control circuit takes as an input VOUT1, which depends upon the charging of a capacitor, which is a dynamic load:



**The dynamic load is the capacitor being charged by the current coming from the output of the charge pump HV6. The output VOUT1 is the voltage output read by the comparator**

RUSS, AUGUST & KABAT

(Source: TechInsight Report Toshiba/Sandisk 96L 3D NAND Flash Circuit Analysis)

94.     In the Accused Products, the charge pump control circuit includes "a clock driver circuit configured to switch a clock signal supplied to a charge pump circuit between one of a first clock signal and a second clock signal based on the switch clock control signal, wherein the first clock signal has a higher frequency than the second clock signal." For example, the circuitry in the purple rectangle below includes a clock driver circuit, which supplies clock signals CK01 and CK01 inverse (yellow box):



(Source: TechInsight Report Toshiba/Sandisk 96L 3D NAND Flash Circuit Analysis)

95.     These clock signals are supplied to a charge pump circuit:



(Source: TechInsight Report Toshiba/Sandisk 96L 3D NAND Flash Circuit Analysis)

96.     These clock signals are switched between clock signals CLK1 and CLK2 based upon switch clock control signal B4629:



(Source: TechInsight Report Toshiba/Sandisk 96L 3D NAND Flash Circuit Analysis)

97.    The first clock signal CLK1 has a higher frequency than the second clock signal CLK2:



(Source: TechInsight Report Toshiba/Sandisk 96L 3D NAND Flash Circuit Analysis)

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim Plaintiffs respectfully request that this Court enter:

a.      A judgment in favor of Counterclaim Plaintiffs that Counterclaim Defendants have infringed, either literally and/or under the doctrine of equivalents, the '537 Patent, the '240 Patent, the '365 Patent, the '505 Patent, and the '664 Patent;

b.      A judgment and order requiring Counterclaim Defendants to pay Counterclaim Plaintiffs their damages, costs, expenses, and pre-judgment and post-judgment interest for Counterclaim Defendants' infringement of the '537 Patent, the '240 Patent, the '365 Patent, the '505 Patent, and the '664 Patent;

c.      A permanent injunction prohibiting Defendant from further acts of infringement of the '537 Patent, the '240 Patent, the '365 Patent, the '505 Patent, and the '664 Patent;

d.      A judgment and order requiring Counterclaim Defendants to provide an accounting and to pay supplemental damages to Counterclaim Plaintiffs, including without limitation, pre-judgment and post-judgment interest;

e.      A judgment that Counterclaim Defendants' infringement is willful and enhanced damages and fees as a result of that willfulness under 35 U.S.C. § 284;

f.      A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to Counterclaim Plaintiffs their reasonable attorneys' fees against Counterclaim Defendants; and

g.      Any and all other relief as the Court may deem appropriate and just under the circumstances.

## DEMAND FOR JURY TRIAL

Defendants and Counterclaim Plaintiffs, under Rule 38 of the Federal Rules of Civil Procedure, request a trial by jury of any issues so triable by right.

DATED:  October 31, 2025

Respectfully submitted,

*/s/ Neil A. Rubin*
Brian D. Ledahl (CA SBN 186579)
bledahl@raklaw.com
Neil A. Rubin (CA SBN 250761)
nrubin@raklaw.com
Mackenzie Paladino (NY SBN 6039366)
mpaladino@raklaw.com
RUSS AUGUST & KABAT
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025
Phone: (310) 826-7474
Facsimile: (310) 826-6991

***Attorneys for Defendants and Counterclaim Plaintiffs IPValue Management, Inc. and Longitude Flash Memory Solutions Ltd.***

43

## CERTIFICATE OF SERVICE

I certify that on October 31, 2025, a true and correct copy of the foregoing document was electronically filed with the Court and served on all parties of record via the Court's CM/ECF system.

_/s/ Neil A. Rubin_____
Neil A. Rubin

RUSS, AUGUST & KABAT